■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAWRENCE GORDON, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County, rendered November 24, 1978, convicting him of murder in the second degree (two counts), upon a jury verdict, and imposing sentence. Judgment reversed, on the law, and new trial ordered. On the evening of May 3, 1977, after a preliminary police investigation, defendant was taken from the location at which the victim's body was found to the headquarters of the Tenth Homicide Zone. At 1:20 A.M. on May 4, 1977, a police detective, accompanied by a police sergeant, read defendant his *Miranda* warnings. Defendant agreed to speak without an attorney present, and began to make an exculpatory statement. When the detective questioned the truth of the statement and indicated that other witnesses had given the police conflicting accounts of what had transpired the previous evening, defendant accused them of lying, and accused the police of trying to trick him. He then stated, "I want to talk to a lawyer." The detective asked defendant if he would repeat his request for a lawyer to an Assistant

District Attorney; defendant agreed, and no further questions were asked. At approximately 3:50 A.M., Assistant District Attorney Speiser entered the room in which defendant had been placed. A stenographer also entered and began setting up his machine. Before he could finish doing so, defendant stated that he had a cousin who worked in the District Attorney's office and that he wanted to see him. The stenographer completed setting up his machine, at which time Speiser read the *Miranda* warnings to defendant. After being informed of each of his rights, defendant indicated that he understood, except for the last one, at which point the following transpired: "Question: If you cannot afford a lawyer, you'll get one free of charge; do you understand that? Answer: Will he come here? Question: Do you understand that? Answer: I understand it. Question: If you decide to speak to me at any time you wish you can stop speaking to me. You can stop at any point if you don't want to answer a question. Answer: I want to call my wife, my father. Question: Do you understand that? Answer: I understand your department. Question: Now that I have advised you of your rights, are you willing to speak to me without having a lawyer present? Answer: I want a lawyer present. Mr. Speiser: Thank you. I have no further questions." Speiser then called defendant's cousin, Horne, who arrived at the station house shortly thereafter. A short conversation between Speiser, Horne and defendant was not recorded. When the stenographer was ready, Speiser again questioned defendant, this time with Horne present. The interrogation began with Speiser informing defendant: "I advised you of your rights before. You also said you wanted to speak to John Horn *[sic]* who is a cousin of yours. And John Horn *[sic]* is a police officer who works for the District Attorney's Office. You told me you wanted to speak to him. John Horn *[sic]* is presently here. I just want to tell you he is a police officer who works in the District Attorney's Office. If you say anything to him it's the same as talking to me or to the police. Answer: I feel safer. I take him as a cousin. I will not incriminate me. You were a gentleman. You said I was a possible suspect. Question: Do you wish to speak to Mr. Horn *[sic]*? Answer: Yes. Question: I want you to understand he is a police officer. Answer: I know it and this statement could go to court. Question: Would you like me and the stenographer to step out of the room? Answer: At this time, no. Question: Is there anything you wish to say? Answer: Like I told these cops, which I shouldn't say without a lawyer present." Defendant then proceeded to give another exculpatory statement in response to questions by Speiser and Horne. After Speiser indicated he had no further question, defendant stated: "I want to speak to John [Horne] alone. Mr. Speiser: You know what he is, right? The Witness: I know you can bring him in to testify." Horne and defendant talked alone for 10 to 15 minutes, during which time he made an inculpatory statement and after which time Horne came out and indicated that defendant had something further to say. Speiser and Horne, accompanied by the stenographer, went back into the room, where Speiser questioned defendant: "Question: Larry, can you talk to me a second? Answer: All right. Question: When I first came in and spoke to you earlier tonight I told you your rights. At that time you told me you understood; is that right? Answer: Yes. Question: You told me at that time that you wanted a lawyer and you wanted to speak to John Horne, your cousin, who works in the DA's office; is that right? Answer: Yes. Question: At that time I didn't ask any questions? Answer: No, you did not. Question: I told you I would try to get ahold of your cousin; is that right? Answer: Yes. Question: I called John Horne down. I explained to you he is a police officer, and anything you say can be used against you; is that right? Answer: Yes. Question: Are you

willing to talk to him? Answer: I did talk to him. Question: You are willing to talk without a lawyer being present; is that right? Answer: Right. Question: You are now willing to talk to him wihout [sic] having a lawyer? Answer: Right. Question: You said that to me before when the stenographer wasn't in here; is that right? Answer: Right. Question: You trust John Horne, and you would tell him? Answer: He advised me of the rights again. Question: He advised you of the rights, too? Answer: Right. Question: Are you willing to speak now without an attorney? Answer: Yes. Question: Even though you said before you want a lawyer? Answer: Yes. Question: Are you willing to speak? You understand you have the right to a lawyer? Answer: Yes, I do. Question: You said before you wanted a lawyer. Now you're willing to speak without a lawyer? Answer: Yes. Question: No one has forced you to speak? You're doing this of your own free will? Answer: Yes, I am." This time, defendant changed his story, admitted he was responsible for the victim's death, and recounted the events of the previous evening. After defendant indicated he had nothing further to say, Speiser asked defendant the following: "Question: John Horne is in the room. He's your cousin; is that right? Answer: Right. Question: Has anyone threatened you in any way, anyone abused you in any manner? Answer: Abuse me, no. Question: You're telling this to us of your own free will; is that right? Answer: Yes. I did it earlier when he was questioning me. I did say I'd like to speak to the lawyer. I asked to call my lawyer. I didn't have a chance to call my lawyer. You spoke to me. I trusted you, and I asked for John. I know he's from your office. I felt safe with him. Question: You did understand you still have the right to a lawyer? Answer: Yes, I did. Question: You did understand that I'm a District Attorney, and I work with the police? Answer: I know you're a prosecutor. Question: You understand that John Horne is a police officer? Answer: He's an investigator. Question: You understand what I said to you, that this can be used against you? Answer: Yes. Question: Yet you're willing after that not to speak to a lawyer and speak to us? Answer: Yes. Question: You understand you still have the right to have a lawyer? Answer: Yes." At the trial, the People introduced defendant's inculpatory statements and his conviction followed. In *People v Cunningham* (49 NY2d 203), decided January 15, 1980, the Court of Appeals held that once a suspect in custody requests the assistance of counsel, he may not be questioned further in the absence of an attorney, or, in other words, that an uncounseled waiver of a constitutional right will not be deemed voluntary if it is made after the right to counsel has been invoked. Any statement made after such uncounseled and, therefore, involuntary waiver must be suppressed. The question squarely before us, therefore, is whether the rule announced in *Cunningham* should be applied retroactively. In *People v Prince* (50 NY2d 883), the Court of Appeals applied the *Cunningham* rule to conduct occurring in December of 1976, reversing a conviction rendered by Criminal Term, March 10, 1978 and affirmed without opinion by this court July 2, 1979. In *Prince,* therefore, the Court of Appeals clearly indicated an intent to apply *Cunningham* retroactively. Even absent the holding in *Prince,* however, we would have applied *Cunningham* retroactively and reversed. The criteria to be considered in determining whether a decisional rule should be applied retroactively are (1) the purpose to be served by the new rule, (2) the extent of the reliance by law enforcement authorities on the old rule, and (3) the effect on the administration of justice of a retroactive application of the new standards *(People v Morales,* 37 NY2d 262, 269; *Desist v United States,* 394 US 244, 249). The purpose of the *Cunningham* rule is to protect an accused's right to counsel and to enforce

such right by excluding any statements taken in derogation of such right. This purpose is based on the belief that "the presence of an attorney is the most effective means we have of minimizing the disadvantage at which an accused is placed when he is directly confronted with the awesome law enforcement machinery possessed by the State" *(People v Cunningham,* 49 NY2d 203, 207, *supra).* Although the United States Supreme Court has stated that it favors prospective application for any decision amplifying the exclusionary rule *(Desist v United States,* 394 US 244, 249, *supra),* the *Cunningham* rule rests solidly and exclusively on State constitutional law *(People v Cunningham, supra,* p 207), and the courts of this State have "consistently exercised the highest degree of vigilance in safeguarding the right of an accused to have the assistance of an attorney at every stage of the legal proceedings against him" *(People v Cunningham, supra,* p 207). The second criterion, the extent of reliance by law enforcement officials on the old rule, is not really applicable. *People v Cunningham (supra)* did not overrule a prior precedent of long standing; rather it "represents but a logical extension" of principles developed over a long line of cases, the so-called *Donovan[1]-Arthur[2]* line *(People v Cunningham, supra,* p 209; see, also, *People v Hobson,* 39 NY2d 479; *People v Aponte,* 69 AD2d 204). Absent substantial reliance on an "old" rule, the effect of the "new" rule on the administration of justice cannot be great *(People v Morales,* 37 NY2d 262, 270, *supra).* We are also mindful of the observation of the court in *Morales* (p 270) that "right to counsel decisions are among those which have most commonly been deemed retroactive." This is not a decision which governs the conduct of police on the street, possibly forcing them to act contrary to their training and instincts to insure the legality of an arrest. When a suspect is in police custody the police, not the suspect, hold all the cards and are in a much better position to follow technical legal guidelines than they are in the street. Thus, our decision does not "punish" what may at the time have been a good street arrest. Here, defendant clearly invoked his right to counsel. Neither the police nor the District Attorney's office made any effort to obtain counsel for defendant, and defendant's subsequent waivers were therefore uncounseled and involuntary. We have examined defendant's other contentions and find them to be without merit. Accordingly, defendant must be granted a new trial at which the statements taken in derogation of his right to counsel must be suppressed. Lazer, J. P., Gibbons, Rabin and O'Connor, JJ., concur.

---

1. *People v Donovan,* 13 NY2d 148.

2. *People v Arthur,* 22 NY2d 325.