574 A.2d 356

**Ravon PERKINS**

v.

**STATE of Maryland.**

**No. 1541, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

June 6, 1990.

342

'Matt P. Lavine, Assigned Public Defender of College Park (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

M. Jennifer Landis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and William R. Hymes, State's Atty. for Howard County, Ellicott City, on the brief), for appellee.

Argued before MOYLAN, WILNER and CATHELL, JJ.

MOYLAN, Judge.

The appellant, Ravon Perkins, was convicted by a Howard County jury of possession of cocaine with intent to distribute and of possession of narcotics paraphernalia. Upon this appeal, he raises the following four contentions:

1. That the charges against him should have been dismissed because of the failure of the State to bring him to trial within 180 days;

2. That the physical evidence should have been suppressed as violative of the Fourth Amendment;

3. That the prosecutor's rebuttal argument was improper; and

4. That he was denied the opportunity to present an effective Challenge to the Array.

Because we are compelled to reverse the convictions on the basis of a Fourth Amendment violation, the third and fourth contentions are moot.

At approximately 1 A.M. on the morning of August 30, 1988, the appellant checked into the Red Carpet Inn in Laurel. At 2:30 A.M., two uniformed Howard County policemen entered his room and ultimately seized the evidence upon which the charges were based. At issue is the constitutional propriety of both the initial entry and the conduct of the police in the room following that entry.

For the period of its use and occupancy, a hotel or motel room becomes, for Fourth Amendment purposes, the equivalent of the occupant's home. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949). Involved is what has come to be called "the core value" of the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). Whereas in many areas of Fourth Amendment litigation, the so-called "centrality of the warrant requirement" with its limited list of jealously guarded and tightly circumscribed exceptions (the approach to the Fourth Amendment

championed by the Warren Court during the 1960's) has in the later case law yielded to the so-called "general reasonableness" or balancing approach, the earlier attitude of guaranteeing more maximal protection has continued to prevail when the search intrudes into a citizen's place of residence. It was of this core value that the Supreme Court spoke in *Welsh v. Wisconsin, supra,* 466 at U.S. 748–749, 104 S.Ct. at 2096–2097:

> "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' ... And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.... It is not surprising, therefore, that the Court has recognized as 'a "basic principle of Fourth Amendment law[,]" that searches and seizures inside a home without a warrant are presumptively unreasonable.' " (Citations omitted).

It was of this same "core value" that Judge McAuliffe spoke in *Doering v. State,* 313 Md. 384, 397, 545 A.2d 1281 (1988):

> "In assessing the gravity of an intrusion, we consider the objective expectation of privacy that reasonably existed, and the extent to which it was invaded. When the expectation of privacy is legitimately high, only the most exigent circumstances will justify a warrantless intrusion. Thus, when the sanctity of the home is involved, the exceptions to the warrant requirement are few."

The exemption from the warrant requirement that the State relies upon in this case is that of first-party consent. There is no question that the appellant was the person authorized to grant or to withhold consent to the search of his hotel room. At issue is the quality of his alleged consent. On that subject, the allocation of the burden of proof is clear. As the Supreme Court stated in *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968):

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." (Footnote omitted).

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), made clear that the same voluntariness standard will be used to judge consent that has traditionally been used to assess the voluntariness of a confession under the Due Process Clause. The Supreme Court spoke of the efficacy of this standard to accommodate the legitimate needs of law enforcement with the legitimate protection of the citizenry from coercion:

"The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would jeopardize their basic validity. Just as was true with confessions, the requirement of a 'voluntary' consent reflects a fair accommodation of the constitutional requirements involved."

412 U.S. at 229, 93 S.Ct. at 2048. In assessing voluntariness, it is necessary to be alert not only to heavy-handed and overtly coercive investigative techniques but also to "subtly coercive police questions" and to "the possibly vulnerable subjective state of the person who consented":

"In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent

searches, from the traditional definition of 'voluntariness.' "

*Id.*

■ As we are called upon to review the constitutionality of an allegedly consensual search, our standard of review is clear. We extend great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts. With respect to the ultimate, conclusionary fact of whether the act of consent was truly voluntary, however, we are called upon to make our own independent, reflective constitutional judgment. In dealing with the precisely analogous question of voluntariness in the context of confession law, we observed in *Walker v. State*, 12 Md.App. 684, 695, 280 A.2d 260 (1971):

> "What we mean, therefore, when we say that we have the obligation to make an independent, reflective constitutional judgment on the facts whenever a claim of a constitutionally-protected right is involved is that, although we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested, etc.) we must make our own independent judgment as to what to make of those facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness."

In dealing with the precise issue now before us, the voluntariness of consent, Judge Adkins made it clear in *Gamble v. State*, 318 Md. 120, 128, 567 A.2d 95 (1989), that the appellate responsibility is to make an independent constitutional appraisal:

> "Our duty in a case like this is to make an independent constitutional appraisal of the record in order to resolve any question as to the trial judge's finding of voluntariness."

*See also State v. Wilson,* 279 Md. 189, 202, 367 A.2d 1223 (1977).

As we undertake our independent constitutional appraisal, we note initially the dearth of any findings of first-level fact, fact finding of the type to which we would ordinarily extend great deference. The finding of the suppression hearing court was little more than the conclusion that the police entry into the appellant's room was consensual.

Our independent conclusion is that the initial police entry into the room was not consensual and, furthermore, that police actions in the room following the entry went well beyond the scope of any even arguable consent.

The police justification for approaching the room in the first instance was very strained. In the early morning hours of August 30, Officer Shifflett responded to a radio call to see the desk clerk at the Red Carpet Inn. The officer testified that the clerk "told me that she believed there was a subject staying in a room by the name of Ravon Perkins who was wanted because another police officer had been inquiring about that individual just days before, and she had rented a room to him." By radio, Officer Shifflett made a computer check to see if there were any outstanding warrants for the appellant. There were none.

The officer nonetheless justified his decision to proceed to the appellant's room to verify his identity on the ground that an open warrant might be only a few days old and, therefore, not yet in the computer. How the verification of the appellant's identity would fill that void is not suggested. The officer also posited that the computer check may not have been accurate because the officer did not know Perkins' date of birth. If the name "Ravon Perkins" did not turn up at all, we are at a loss to understand what assistance his date of birth might have been.

As we make our independent constitutional judgment, we are being asked to believe that the police, scrupulously deferential to the appellant's rights and prerogatives, would enter the appellant's room only with his full consent and

would, therefore, refrain from entering his room if that consent were not forthcoming. Our credulity is strained in this regard, however, by the bizarre circumstance that the police obtained a passkey from the clerk before proceeding to the appellant's room. If no one had responded to their knock, would they have entered with the passkey? If the response to the request for consent to enter had been in the negative, would they have entered with the passkey? What possible purpose could the passkey have served if they fully intended, as we are asked to believe, to honor the appellant's right either to grant or to withhold consent?

In any event, notwithstanding the absence of any outstanding warrant and armed with the passkey, Officer Shifflett and another uniformed officer proceeded to the appellant's room. At first, they listened at the door. They heard two males talking quietly. In the subtle chemistry of factors, we find at least marginal significance in the fact that Officer Shifflett, at 2:30 A.M., then rapped upon the door not with his knuckles but with a metal flashlight. There is at least a flavor of peremptoriness in the choice of instrumentality. When a male voice from the inside inquired, "Who is it?," the response was, according to the consensus recollection,[1] "Howard County Police, open the door." It is our independent conclusion that that response, following the rapping upon a bedroom door at 2:30 A.M. with a flashlight, was in the imperative mood, not the interrogative mood. Those are words of command, not of request. We believe of the opening of the door that followed even as we did in *Titow v. State*, 75 Md.App. 555, 558, 542 A.2d 397 (1988):

"Even accepting the State's most favorable version of the facts, as we must, we nonetheless conclude that those

---

**1.** This was the version testified to by both the appellant and a female occupant of the room. It was, furthermore, the version contained in the written report made by the officers immediately after the arrest. Officer Shifflett's testimony at trial, however, was that his earlier report was incorrect and his actual words were, "Could you open the door, I'd like to talk to you?"

facts, as a matter of law, do not establish voluntary consent within the contemplation of *Schneckloth v. Bustamonte*. As *Schneckloth* discussed and as *Bumper v. North Carolina* ... made clear, even ostensible consent is not voluntary when it is 'no more than acquiescence to a claim of lawful authority.'" (Citation omitted).

Indeed, the appellant's version of why he opened the door was one of nothing but acquiescence, "I had to open it, he ordered me, told me to open the door ... it's the police, Howard County Police, open the door."

Even if the State were to overcome the hurdle of the initial opening of the door, however, what followed gives rise to additional skepticism. The opening of the door is not the same thing as police entry into the room. According to the appellant, the officer, upon the opening of the door, immediately asked him for his name and requested identification. The appellant testified that when he turned to get his identification, the officer walked, uninvited, into the room. The appellant testified, "I never invited him in." Indeed, the original police report stated simply, "A black male opened the door and this officer entered telling the subject he was there to investigate a noise complaint." In his trial testimony, however, the officer stated that that earlier report was not wholly accurate. He testified, "After he opened the door, I said I was there to investigate a noise complaint and do you mind if I come in and talk to you and at which time he said sure, come on in."

Even accepting the officer's testimonial version, the officer candidly acknowledged that there had been no noise complaint. He stated that he told the occupants of the room this for his own "safety." If consent to entry was obtained pursuant to a deliberate misstatement, it does call into question the knowing and voluntary quality of the consent. In dealing with the related subject of warrantless doorway arrests, Judge Robert Bell in *Smith v. State*, 72 Md.App. 450, 466–467, 531 A.2d 302 (1987), surveyed the national case law on the subject. Even those cases that legitimated warrantless doorway arrests as occurring out-

side of the protection of the threshold, as in *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), rather than occurring within the protection of the threshold, as in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), insisted that the police use no ruse or subterfuge in getting the suspect to open the door. *People v. Schreiber,* 104 Ill.App.3d 618, 60 Ill.Dec. 417, 421–422, 432 N.E.2d 1316, 1320–1321 (1982) (arrest of defendant at entrance of her home, after she voluntarily opened door in response to police officer's knock held lawful where "there was *no evidence to suggest that subterfuge was used* " (Emphasis supplied)); *Byrd v. State,* 481 So.2d 468, 472 (Fla.1985) (in holding that the arrest at the threshold was the result of a consensual entry, "we choose to accept the view of those courts which have found entries to be consensual where there is no forced entry *or deception,* and when the defendant knows who is asking for admission and then opens the door" (Emphasis supplied)). The use of deception to obtain the opening of a door erodes the consensual quality of that opening. By parity of reasoning, the use of deception to obtain entry into a residence following the opening of a door would also erode the consensual quality of that entry.

Although concededly addressing the different problem of the police affirmatively misleading a detainee as to his legal options, our disdain for such affirmative misleading and our feeling as to its erosive effect upon an ostensible consent that follows, as we expressed it in *Titow v. State, supra,* at 75 Md.App. 560, 542 A.2d 397, is equally applicable to the affirmative misleading that took place, according to the officer's testimony, here:

"The appellant was not only uninformed as to his full constitutional options, he was, at least by strong implication, affirmatively misled as to those options. A significant misrepresentation, by commission or omission, of the constitutional choices available to him is a strong circumstance, in the larger totality of circumstances, militating against the voluntary quality of the appellant's consent.

We hold that even the State's most favorable version of the first-level facts failed to establish, as a matter of law, the ultimate constitutional fact of voluntary consent within the contemplation of the Fourth Amendment."

The officer's version that the appellant consented to the entry into the room so that they could "talk about" the noise complaint strains credulity. What was there to talk about? With respect at least to a first complaint that hotel guests are being too noisy, a quiet and brief request delivered at the door ordinarily suffices. There is nothing to investigate. There is nothing to talk about. There is certainly no occasion to request or demand the identity of the allegedly noisy guests. That version of the consensual entry simply lacks plausibility.

■ Even if the State were to overcome 1) the hurdle of the initial opening of the door, and 2) the hurdle of the subsequent entry into the room, the scope of permission was for the limited purpose of talking about noise. The appellant had one other man and two women as his guests in the room. He certainly did not consent to the police insisting that his guests identify themselves; *a fortiori,* he did not consent to the insistence that his guests produce documentary evidence of their identification. The whole scenario smacks of the entry into the room, for a noise complaint or for identification, being little more than a subterfuge to look around and spot the "small glass object" and the "blow torch" that were subsequently seized under the ostensible authority of the plain view doctrine.

Even if we were to go with the police purpose of using the noise complaint as a mere device to obtain entry for the ostensibly real purpose of ascertaining the appellant's identity, there is no suggestion as to why merely asking the appellant his name and his age would not have sufficed. To request (or demand) that he produce documentary evidence of his identity is sufficiently heavy-handed to tilt further against voluntary consent. The apparently real purpose for the police being in the appellant's room emerges from the

fact that after they insisted that the appellant produce documentation as to his identity, they went and stood over him as he reached into his bag to obtain such documentation. They looked into the bag and observed the razor blades that they believed to be paraphernalia for the use of cocaine.

The final increment with respect to a scope violation, even assuming valid consent for the initial entry, was the police entry into the bathroom. By no version of the facts did the police ever request permission to use or enter the bathroom, let alone receive such permission. There was no justification for such gratuitous "poking about." It was there that they found the suspicious plastic bag floating in the toilet bowl, which turned out to be the key evidence in the case.

■ The State now seeks to legitimate the search of the bathroom as an incident of the appellant's arrest, claiming that the plain view spotting of the two items in the room and the razor blades in the appellant's bag gave them probable cause for such arrest. It is not necessary even to inquire whether the bathroom was within the appellant's "reach, lunge or grasp" within the contemplation of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The short answer is that the appellant had not been placed under arrest when the police entered and searched the bathroom. For a valid search incident to lawful arrest, there must be an actual arrest, not simply the accumulation of probable cause for such an arrest. This is not a situation where the arrest and the search incident were essentially contemporaneous. It is rather a situation where the police did not even determine to arrest the appellant until after spotting the plastic bag in the toilet. The physical evidence seized in the appellant's room should have been suppressed.

Because we are reversing the conviction and remanding for a new trial, it is necessary to address briefly the appellant's first contention. The short answer to it is that the Administrative Judge, Judge J. Thomas Nissel, found

good cause to grant the postponement of the appellant's trial beyond 180 days. We perceive no error in that.

JUDGMENTS REVERSED; COSTS TO BE PAID BY HOWARD COUNTY.