732 A.2d 376

Corey Anthony WILLIAMS

v.

STATE of Maryland.

No. 1123, Sept. Term, 1998.

Court of Special Appeals of Maryland.

July 2, 1999.

210

Jack B. Rubin, Assigned Public Defender (Flynn M. Owens, Assigned Public Defender, on the brief), Baltimore, for Appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Argued before KENNEY, BYRNES, and PAUL E. ALPERT (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellant, Corey Anthony Williams, was indicted by a Grand Jury in the Circuit Court for Baltimore County and charged with first-degree murder, felony murder, robbery with a dangerous and deadly weapon, and theft. A co-defendant, Fransharon Jackson, was tried separately. Hearings on pre-trial motions were held on January 9 and 14, 1998, and appellant's case was continued until the conclusion of Jackson's trial.[1] Appellant's jury trial began on May 18, 1998, and, on May 21, 1998, the jury acquitted him of first-degree murder, but found him guilty of felony murder, robbery with a dangerous and deadly weapon, and theft. On July 16, 1998, appellant was sentenced to life imprisonment for the felony

---

1. Jackson was convicted of felony murder.

murder conviction, and the remaining convictions were merged.

## Questions Presented

Appellant presents two questions for our review:

1. Was appellant's confession voluntary under Maryland non-constitutional law, as well as under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights?

2. What duty, beyond the cessation of questioning, do the police have when a suspect requests an attorney?

We hold that the confession was voluntary. We decline to answer the second question, but we address the contention, raised in the body of appellant's brief, that the police violated his constitutional rights as guaranteed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We reject this contention, and we affirm.

## Standard of Review

In reviewing the denial of a motion to suppress, we consider only the record of the suppression hearing and do not examine the record of the trial. *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987) (quoting *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438, *cert. denied*, 294 Md. 652,(1982)). We grant great deference to the suppression hearing judge's findings of fact and determinations of credibility. *McMillian v. State*, 325 Md. 272, 282, 600 A.2d 430 (1992); *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990). The facts as found by the suppression hearing judge are accepted unless clearly erroneous. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346–47, 574 A.2d 356. In addition, we review the evidence in the light most favorable to the prevailing party. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Cherry v. State*, 86 Md.App. 234, 237, 586 A.2d 70 (1991). However, we make an independent constitutional determination of whether the confession was admissible by examining the law and

applying it to the facts of the case. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Perkins*, 83 Md.App. at 346, 574 A.2d 356.

## Facts

After a hearing on January 14, 1998, the circuit court denied appellant's motion to suppress an inculpatory written statement he gave while in police custody. Appellant contends that denial constituted error. There is some disagreement about the facts; we first recount those adduced from police testimony at the motion hearing, and then those presented by appellant.

The body of Claude Bowlin was found in Bowlin's house in Essex on August 18, 1997. He apparently had been killed in the previous 24–48 hours. After an investigation, detectives arrested appellant and Jackson inside a house at 931 North Stricker Street in Baltimore City at 11:15 p.m. on August 22, 1997. Detective Milton Duckworth handcuffed appellant, placed him in a police car, advised him of his *Miranda* rights, and told him he was being charged with first-degree murder for Bowlin's death. Duckworth drove appellant to Baltimore County Police Headquarters in Towson, but did not ask any questions during the trip. They arrived at approximately 11:40 p.m.

Appellant was immediately taken to an interview room on the tenth floor, where he was restrained with handcuffs and leg irons. Duckworth again told appellant he was being charged with first-degree murder, and asked appellant if he understood the *Miranda* rights explained to him in the car. Appellant said that he did, and agreed to speak with Duckworth. At the hearing, Duckworth did not testify about the statements appellant made at that point, except to say that appellant indicated he was aware of Bowlin's death, and appellant was able to describe where he had been and what he had been doing on August 17, 1997.

Duckworth testified that he believed appellant was sober, because appellant's speech was clear, coherent, and logical. At approximately 12:35 a.m., Duckworth read appellant an

advice of rights form, which repeated the *Miranda* warning. Duckworth then asked appellant if he would provide a written statement. Appellant declined, and stated that he wished to speak with an attorney before giving a written statement. Duckworth immediately terminated the interview.

Duckworth completed an arrest report and then took appellant to the basement, where appellant was fingerprinted and photographed. At 1:30 a.m., Duckworth took appellant back to the tenth floor interview room, took his clothing, and issued him a Detention Center jumpsuit. When taking appellant's clothes, Duckworth, for the first time, noticed an odor of alcohol on appellant or his clothes, but Duckworth still believed appellant was sober. Duckworth testified that he did not ask appellant any questions at that point, but that appellant asked him "if I thought he should give a written statement." Duckworth replied that he could not offer any legal advice on what appellant should or should not do.

At 1:57 a.m., Duckworth left the room. He testified that, as he did so, he asked Officer Sean Needham to enter the room "just to sit with" appellant while Duckworth talked to other detectives about the ongoing investigation, including Fransharon Jackson's simultaneously occurring interview.[2] Needham had not been participating in appellant's interrogation. Duckworth testified that his purpose in asking Needham to step into the room was "Prisoner security. I wasn't going to be in the room with him and we can't leave prisoners by themselves in the building." Duckworth told Needham that appellant had requested an attorney and that all Needham had to do was sit with appellant.

At 2:30 a.m., Needham left the interview room and told Duckworth that appellant wanted to make a written statement. Duckworth immediately told Needham to "document

---

2. Needham was the first uniformed officer called to Bowlin's house after the body was found. Duckworth testified that police department policy was "when we have a uniformed officer who responds to a homicide, they come and are assigned temporarily to the Homicide Unit to assist in the investigation."

what had transpired" during the time Needham was in the room with appellant. At the suppression hearing, Needham testified that after he went into the room at 1:57 a.m., he and appellant had an intermittent conversation, with pauses between exchanges. During the pauses, Needham was merely looking out the window. First, appellant said he was cold and asked for coffee. Needham said there was no coffee made, but he would get appellant a drink after Duckworth returned. Appellant asked why the room was so cold, and Needham explained that the air conditioning ran all night because of the building's computers. Appellant asked if Jackson was giving a written statement, and Needham said he did not know what she was doing.[3] Appellant asked Needham what Needham would do if he were in appellant's shoes. Needham said he could not answer that. Appellant asked Needham whether, if Needham were going to lie, he would do so in a verbal or written statement. Needham replied that he definitely would not lie in a written statement. Appellant said that he guessed he would be going away for a long time. Needham replied that he did not know and that it depended on what appellant had done. Appellant asked if Needham drank a lot, and Needham replied that he did not. Needham asked if appellant drank a lot, and appellant said "Yes, you can see why." Needham asked what appellant meant, and appellant said that had Needham been at the house when appellant was arrested and seen appellant's uncle he would understand why appellant drank a lot.

Needham testified that throughout the conversation appellant appeared upset and had obviously been crying. After mentioning his uncle, appellant "started to breakdown a little bit and cry. He was kind of like shaking in his chair, just like rocking a little bit talking to himself." Needham felt uncomfortable because appellant was crying, so he got up and walked over to the door to see if Duckworth was returning. Appellant asked if Needham could remove "these," apparently

---

**3.** She was apparently being held on the same floor as appellant, but far enough away that they could not hear or see each other.

meaning his handcuffs or leg irons. Needham asked, "For what?," and appellant "gestured over to the table that he was going to write." Needham helped appellant stand up, walk over to the table, and sit down. Needham slid him a writing pad and went to call Duckworth.

When Needham came out, at 2:30 a.m., and said that appellant wanted to write a statement, Duckworth went back in the room and confirmed that appellant wanted to do so. Before taking a statement, Duckworth had appellant complete a second advice of rights/waiver form, indicating appellant's understanding and waiver of his *Miranda* rights. Unlike the previous use of this form, at 12:35 a.m., this time Duckworth had appellant sign his initials next to each right after reading it, to indicate that he understood them. Appellant initialed each right and signed this waiver form at 2:41 a.m.

Appellant then completed a written statement containing three parts. The first three and a half pages, transcribed by Duckworth, were questions concerning voluntariness that Duckworth asked orally, and to which appellant responded orally. Duckworth testified:

> I was trying to establish voluntariness on the part of Mr. Williams. He had earlier requested an attorney. At that point I had terminated the interview with him and had no intention of attempting to take a written statement from him once he invoked his rights. However, when he indicated that he now wished to make a written statement, I wanted to make sure that he was clear in his mind that he understood what he was doing.

After the initial questions, which confirmed that appellant had previously declined to give a written statement, but had now changed his mind, Duckworth asked: "Why do you now wish to make a written statement?" Appellant answered: "Because I did not tell the complete truth in my oral statement." Duckworth also asked, "Has anyone told you that it would be better for you to make a statement since that time?," to which appellant replied, "No." Appellant said that he had

not been promised anything in return for giving a written statement.

The following sequence was also transcribed by Duckworth:

[By Duckworth] Q: Are you currently under the influence of any drug or narcotic?

A: No.

Q: Are you currently under the influence of alcohol?

A: Yes.

Q: Are you currently intoxicated?

A: I have a hangover.

Q: Are you currently sick?

A: No.

Q: Do you know where you are?

A: Yes.

Q: Do you know why you are here?

A: Yes.

Q: Do you feel your mental capacity is currently impaired in any manner?

A: Not by alcohol or any kind of drugs, no. Maybe emotionally.

Q: When you say emotionally, is that because of the charges facing you?

A: No. It's because of what happened, not because of the consequences, but because a life is gone.

Q: Is it now your desire knowing that this statement can and will be used against you to provide a written statement as to what occurred on the evening of 8/17/97 into the early morning hours of 8/18/97 without the services thes [sic] of an attorney?

A: Yes.

Appellant reviewed Duckworth's transcription and initialed each line that represented a response from appellant. Starting at 3:02 a.m., appellant himself wrote a three-and-a-half page statement, in which he explained that he was angry with Fransharon Jackson, his girlfriend, for hanging out with

"Chip" (apparently Claude Bowlin). Appellant alleged that Jackson and Bowlin were doing drugs and having sex together. After an argument between appellant and Jackson, Jackson told appellant that Bowlin had some valuable electronic equipment. She suggested they steal the equipment, and she would then stop fraternizing with Bowlin.

Appellant and Jackson went to Bowlin's house, where Jackson began to have sex with Bowlin in a bedroom, while appellant first waited outside the house and then snuck into the kitchen. Jackson came to the kitchen and, unbeknown to Bowlin, spoke briefly with appellant, telling appellant that she had been unable to find cash that she believed Bowlin had hidden in the house. She suggested that appellant knock Bowlin out so that they could look for the cash without interruption and could take the other valuables. Accordingly, Jackson returned to the bedroom and resumed having sex with Bowlin. Appellant took a stein or mug from the kitchen, snuck into the bedroom, and struck Bowlin on the head with the mug.

According to appellant, Jackson left the bedroom and got a knife, then returned and started to strike toward Bowlin. Appellant wrote that he blocked her intended stabbing, but after they observed that Bowlin was still moving and groaning appellant struck him twice more with the mug. Jackson then tied a cloth around Bowlin's head.[4] The pair took valuables from the house, including a VCR and a portable stereo.[5]

---

4. Bowlin's nude body was found on his bed, with a cloth tied around his head, obstructing his mouth. On his head, he had severe blunt trauma wounds and small cutting wounds. The medical examiner testified at appellant's trial that the cause of death was trauma to the head and asphyxiation.

5. The police identified appellant and Jackson as suspects after finding Jackson's phone number on Bowlin's caller ID machine, and then observing Jackson's neighbors walking out of their apartment complex with Bowlin's VCR and stereo. Police identified the equipment by serial numbers. The neighbors, who had purchased the equipment from appellant and Jackson, were initially charged with possession of stolen property, but those charges were dropped.

Appellant wrote that they did not intend to kill Bowlin and that he and Jackson had cried every day since the robbery.

After Duckworth and Needham testified at the suppression hearing, appellant presented two witnesses. First, a Baltimore County Assistant Public Defender testified that at least one member of his office is on call 24 hours each day, and that the homicide department, where appellant was interrogated, was sent a schedule of the on-call public defenders and their phone numbers.

Appellant then testified, saying that he was twenty-six years old, and had had numerous encounters with the criminal justice system, but had never been given *Miranda* warnings during any of his prior arrests. He said that, in the hours immediately prior to his arrest, he had consumed almost one-half of a fifth of rum and an entire 40–ounce beer, and had smoked marijuana. He said he was about 5'5" tall, and weighed approximately 160 pounds. In the police car he felt "dizzy" from the alcohol and marijuana.

Appellant remembered telling Duckworth, when first entering the interview room, that he understood his *Miranda* rights. Appellant testified, however, that Duckworth initially asked for a statement; appellant said "I told him at first, no, I wanted a lawyer," but Duckworth had no response. Appellant gave an oral statement about his whereabouts on August 17. Duckworth produced a form for appellant to review and sign as a prelude to a written statement. Appellant testified, "I told him I did not want to write anything out, I wanted a lawyer, because I was scared." When asked why he would not sign the waiver of rights form, appellant testified, "Because I asked for a lawyer over and over again and he never gave me one. I figured if I started signing this that I would probably be going to jail for a long time and everything."

The two men went to the basement for the fingerprints and photographs, then returned to the tenth floor and exchanged appellant's clothes for the jumpsuit. Appellant testified that during this time, he asked to be allowed to make a phone call to check on his child and to ask a relative to get him a lawyer.

He said Duckworth did not respond to his requests. Appellant testified, however, that Duckworth's testimony was accurate concerning the exchange in which appellant asked if he should give a written statement, and Duckworth replied that he could not advise appellant either way.

Duckworth then left the room. Appellant testified briefly about Officer Needham:

[From defense counsel] Q: [D]id someone else come in the room?

A: I know I fell asleep because my head was spinning and I remember I woke up and I seen at least who I thought was the officer who was sitting here. I can't remember if he was the one or not, but it kind of looked like him.

Q: Do you recall your conversation with him?

A: Yeah.

Q: Did he testify as to what your conversation was?

A: Yeah.

Q: Did you, in fact, ask to give a written statement?

A: Yes.

Appellant was then asked why, after not signing the waiver of rights form when it was presented to him at 12:35 a.m., he signed the form at 2:30 a.m. He testified:

A: I kept asking for a lawyer over and over again. Every time I asked, I wasn't given one. So, I signed this time because I felt as though all the other times that I asked I wasn't going to be appointed one anyway. So, I just went on and did it.

THE COURT: You weren't going to be appointed one? Is that what you said?

A: That's the way it seemed, because at one time Detective Duckworth told me I wouldn't be able to receive a Public Defender because he was going on vacation and I wouldn't be able to receive one until five days after I got over to the Baltimore County Detention Center.

. . .

[Defense counsel] Q: Do you recall when he told you that?

A: He told me that when I asked for a lawyer before I had actually written this out. That is one of the reasons why I started writing it, because he said I wouldn't be able to give him a statement or even see a lawyer or anything until five days after I got over to the BCDC.

Q: Now, was that before you gave him the oral statement or this statement?

A: That statement.

Q: And that's the written statement?

A: Yes.

On cross-examination appellant admitted that he had been arrested numerous times, but still maintained that he had never been read his *Miranda* rights before. He said he asked Duckworth for a lawyer three times: in the police car (at approximately 11:30 p.m.), before the oral statement (approximately 12:30 a.m.), and when he gave the written statement (approximately 2:40 a.m.), but he never asked Needham for a lawyer. Appellant first testified that Duckworth's comment about not getting an attorney for five days was made after appellant's oral statement, but then he said he wasn't sure when the comment was made. Appellant also said that, although he initialed each line of the waiver of rights form at 2:40 a.m., he did not read any of the waivers.

After argument from the parties, the trial court ruled that the written statement was admissible. The court found that appellant's testimony was not credible, citing discrepancies in his testimony about the amount of alcohol he consumed and the time in which he drank it. The court expressly disbelieved that appellant requested an attorney while in the police car. The court also did not believe appellant's testimony that Duckworth said he could not get a lawyer for five days; the court pointed out that appellant was inconsistent about when that comment was made. The court found Duckworth's testimony credible, and mentioned that appellant's testimony often supported Duckworth's. The court found that, after appellant asserted his *Miranda* rights and the police respected that assertion by ceasing questioning, appellant made a "free,

voluntary and intelligent waiver of his *Miranda* rights. . . ." Based upon all of these findings, the court denied the motion to suppress.

## Discussion

The Court of Appeals has stated:

The introduction of a confession as evidence against the accused at trial is permitted only where it is determined that the confession was "(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda*."

*Ball v. State*, 347 Md. 156, 174, 699 A.2d 1170 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998) (citations omitted). Appellant asserts that his confession should have been suppressed because it was not voluntary under Maryland law and under the Due Process Clause. He also claims that his constitutional rights under *Miranda* were violated because "when a suspect requests an attorney, police have a constitutional duty to honor said request."

We first consider whether appellant's statement was voluntary under Maryland law and the Due Process Clause. "The definitions of voluntariness enunciated by both the Supreme Court and the Maryland courts are indistinguishable from one another." *Hof v. State*, 97 Md.App. 242, 283, 629 A.2d 1251 (1993), *aff'd*, 337 Md. 581, 655 A.2d 370 (1995). A confession is admissible under Maryland common law if it was freely and voluntarily given. *Hoey v. State*, 311 Md. 473, 481, 536 A.2d 622 (1988).

Under Maryland nonconstitutional law, a confession is inadmissible unless it is "shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary." Thus, a confession is involuntary if it is induced by force, undue influence, improper promises, or threats.

*Id.* at 483, 536 A.2d 622 (citations omitted). See also *Reynolds v. State*, 327 Md. 494, 504, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993).

■ Voluntariness is determined by a totality of the circumstances. *Reynolds*, 327 Md. at 504, 610 A.2d 782; *Hoey*, 311 Md. at 483, 536 A.2d 622. In *Hof*, the Court of Appeals explained that the "totality of the circumstances" includes:

> where the interrogation was conducted, its length, who was present, how it was conducted, its content, whether the defendant was given *Miranda* warnings, the mental and physical condition of the defendant, the age, background, experience, education, character, and intelligence of the defendant, when the defendant was taken before a court commissioner following arrest, and whether the defendant was physically mistreated, physically intimidated or psychologically pressured.

*Id.* at 596–97, 655 A.2d 370 (citations omitted).

The standard for assessing whether the admission of a statement violates a defendant's Due Process Rights under the Fourteenth Amendment of the U.S. Constitution was set out in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The Supreme Court held that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164, 107 S.Ct. 515. The Court noted:

> "[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"

*Id.* at 164, 107 S.Ct. 515 (citing *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)).

■ Appellant argues that, when he gave his inculpatory statement, he had a hangover and was under mental duress. Appellant does not claim that he was drunk when he gave his

statement, and he never testified that he confessed because he was intoxicated or under undue psychological pressure from the police. Under Maryland law, confessions can be admitted even if the defendant was under the influence of self-administered narcotics at the time he gave the confession. *Bryant v. State*, 229 Md. 531, 536, 185 A.2d 190 (1962).

Based upon appellant's own testimony, and the testimony of Duckworth and Needham, we discern no error in the trial court's finding that there was no improper police conduct causally related to appellant's confession. The officers' conduct, both immediately before appellant's decision and earlier in the night, did not constitute undue coercion. The police questioned appellant until he stated he did not want to give a written statement without a lawyer. The police thereafter did not question appellant until he asked to give a statement. The police conduct simply did not constitute coercion that would render appellant's statement inadmissible.

Appellant's own testimony indicated that his waiver of his *Miranda* rights was voluntary. There is no valid indication that his voluntary waiver was not "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Appellant's mental distress was understandable for someone charged with murder, but his distress does not necessitate a finding that he was incapacitated or unable to make a knowing, intelligent, and voluntary decision to waive his rights. Appellant's behavior throughout the period after his arrest indicated that he understood his *Miranda* rights, and that he knew the police could not force him to give a statement. The State's evidence demonstrated that the police did not coerce appellant to make a statement, and appellant agreed with the officers' depiction of the crucial events. The trial court did not err in admitting the statement.

We now address appellant's *Miranda* argument. We note that appellant does *not* contend that the police improperly reinitiated interrogation after an assertion of *Miranda* rights. Appellant did not disagree with Needham's depiction of their conversation, and appellant therefore concedes that, during

their conversation, it was appellant who suggested he give a written statement. Because of the natural skepticism that may arise when police produce an "unsolicited" confession from a suspect who previously invoked *Miranda* rights, appellant would not have had to go a great distance to undermine the State's claim that appellant initiated the conversation that produced his written statement. In other words, if appellant claimed that Needham had asked him to give a statement or told him that he should give a statement, a court may be more inclined, given the location and circumstances of their encounter, to believe that the police had initiated the re-interrogation and that appellant's statement was therefore inadmissible. When given the opportunity to strike a crucial, if not fatal, blow to the State's depiction of events, however, appellant did not do so. He did not testify, as he presumably would have if it were true, that Needham or Duckworth had initiated the re-interrogation. Appellant, by his agreement with Needham's testimony, effectively agreed that the conversation that led to the written statement was initiated by appellant.

Inasmuch as appellant concedes that he re-initiated the interview about Bowlin's death, and admits that he offered to give a written statement, our examination is whether the officers' failure to obtain a lawyer for appellant rendered the confession inadmissible. In *Edwards*, the Supreme Court observed:

> In *Miranda v. Arizona*, the Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney. The Court also indicated the procedures to be followed subsequent to the warnings. If the accused indicates that he wishes to remain silent, "the interrogation must cease." If he requests counsel, "the interrogation must cease until an attorney is present."

*Id.* at 481–82, 101 S.Ct. 1880 (citations to *Miranda* omitted).

In *Edwards*, the defendant was arrested and charged with first-degree murder. After being given his *Miranda* warn-

ings, he spoke briefly with a detective and asked for a "deal." The detective asked for a statement, but said he had no authority to negotiate a deal. The police gave Edwards an attorney's phone number, and Edwards spoke briefly with someone at that number. After the call, Edwards told the officers that he wanted an attorney before making any deal. Questioning ceased and Edwards was taken to the county jail.

At 9:15 the next morning, two detectives not involved in the previous day's interrogation came to the jail and asked to speak with Edwards. He said he did not want to meet with them, but a detention officer said "he had" to talk. The detectives gave Edwards the *Miranda* warnings again and played a tape recording of an accomplice's confession. Edwards said he would make an unrecorded statement, and he "thereupon implicated himself in the crime." *Id.* at 479., 86 S.Ct. 1602 Edwards's statement was admitted at trial, and the Arizona Supreme Court affirmed its admission, holding that, after Edwards invoked his rights to counsel and to silence, he had waived those rights "voluntarily and knowingly." *Id.* 451 U.S. at 480, 101 S.Ct. 1880.

The Supreme Court held that this analysis was erroneous, and that a valid waiver "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.'" *Id.* at 482, 101 S.Ct. 1880 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Because the police initiated the conversation with Edwards the day after he invoked his *Miranda* rights, and because he was told he had to speak with them, Edwards's waiver of his rights was not valid and his statement was inadmissible. *Id.* at 487, 86 S.Ct. 1602.

Appellant refers us to several cases from other states, and to one United States Court of Appeals case, that have addressed the issue of whether the police have an obligation to obtain an attorney immediately when a suspect requests one.

We discern a clear separation between this case and most of the out-of-state cases cited by appellant. First, most of those cases precede *Edwards,* and evidence some uncertainty about the very questions answered by that case. *See, e.g., United States v. Womack,* 542 F.2d 1047 (9th Cir.1976); *People v. Cunningham,* 49 N.Y.2d 203, 400 N.E.2d 360, 424 N.Y.S.2d 421 (1980); *People v. Gordon,* 77 A.D.2d 659, 430 N.Y.S.2d 661 (1980); *People v. Aponte,* 69 A.D.2d 204, 418 N.Y.S.2d 651 (1979).

Appellant cites two cases that occurred after *Edwards.* The first, *People v. Cerezo,* 635 P.2d 197 (Colo., 1981), gives appellant scant support. In *Cerezo* the Supreme Court of Colorado addressed a case in which, after a murder suspect undergoing questioning stated "I think I better have a lawyer," the interrogating detectives left her alone for 45 minutes. The suspect, Cerezo, had been arrested in Florida and was being questioned there by both Colorado and Florida detectives, because the crime had occurred in Colorado. After Cerezo's statement about a lawyer, the detectives left the room and met for 45 minutes to discuss whether they could continue to question her without violating her constitutional rights. The Colorado detectives thought they could not, but one of the Florida detectives, Mark Schlein, said he wanted to question Cerezo further and that he would take "whatever heat" occurred for his actions.

Schlein re-entered the room, gave Cerezo some coffee, escorted her to a restroom, and then brought her back to the interview room. There Cerezo asked Schlein how things looked for her. He told her she was in the most serious trouble of her life; when asked for advice, Schlein told her that, in her place, he would either remain completely silent or would be completely truthful. Cerezo asked about a "deal," and Schlein told her there would be no deal, and she should think about her situation. Schlein left the room for a while; when he returned, Cerezo said she would give a statement.

In affirming the trial court's decision to suppress the statement, the Supreme Court of Colorado relied upon the fact that

there was no evidence that the suspect had requested or re-initiated the conversation that led to her statement. "On the contrary," the court held, the evidence showed that Schlein decided to obtain a statement even though he knew it might be in violation of appellant's desire for an attorney. He "engaged in several conversations with her to accomplish this purpose," and his conduct was "contrived and illegal." *Cerezo*, 635 P.2d at 200.

In contrast, in this case the officers did not re-initiate conversation or questioning after appellant said that he wanted to speak with an attorney. Duckworth and Needham testified that Needham was asked to enter the interview room merely for security purposes. As stated above, appellant agreed with Needham's testimony that it was appellant who re-initiated the conversation about the charges he was facing and appellant who volunteered to give a written statement.

The last case appellant cites, *People v. Locke*, 152 Cal. App.3d 1130, 200 Cal.Rptr. 20 (1984), is factually similar to this case. Locke was arrested at 6:35 a.m., given *Miranda* warnings, taken into custody, and charged with attempted murder. She "elected not to say anything until she saw counsel." She remained in one officer's custody for 3 hours, and she was not asked any questions about the crime. Nothing was done to obtain a lawyer for her.

At 9:45 a.m. she was placed in the custody of a second officer, who was told that Locke "had elected not to say anything until she saw counsel." Although Locke and the officer stayed in the same room, Locke was not questioned, nor was she expressly told she could use a telephone to contact a lawyer. The California Court of Appeal's opinion does not specify how long these circumstances continued, but Locke eventually began crying and stated that she wanted to die. The officer "consoled" her, saying, "Don't be ridiculous. He's [the intended victim] not dead. It's not the end of the world." Locke then told the officer about how she had stabbed the victim only after he struck her multiple times; during Locke's trial, the officer testified about her statements.

.

The trial court found her statements to be "spontaneous, voluntary, and admissible."

The California Court of Appeal, in ruling the statements to be inadmissible and reversing Locke's conviction, saw the question as being the duty, if any, of a police officer, after a *Miranda* admonition, to a person indicating a refusal to speak prior to seeing an attorney. The court held that after an arrested suspect elects to be silent until she has consulted counsel, "a minimal requirement" is that the suspect "be given an opportunity[ ] to use a telephone for the purpose of securing the desired attorney. Such telephone calls should be allowed immediately upon request, or as soon thereafter as practicable. Anything less would make of *Miranda* a hollow ineffectual pretense." [6] *Id.* at 1133, 200 Cal.Rptr. 20.

Although we do not reach the same result as the California court, we do not do so because of the different time of day at which the events occurred. In other words, we do not mean to imply that, because appellant was in custody from 11:30 p.m. until giving his statement at 3 a.m., the police have a different duty than they would toward a suspect who was arrested at 6:35 a.m. and apparently confessed later that morning, at some time after 9:45 a.m. Even though the California case involved a custody that was during normal "working hours," when the local public defender's office was presumably open, and this case occurred during the middle of the night, we acknowledge the testimony presented by appellant that indicated a public defender is available 24 hours a day in Baltimore County. There, at least, the police apparently cannot use the clock as an excuse to avoid the provision of an attorney to suspects in custody.

---

6. Parenthetically, we note that, despite the passage just quoted from *Locke*, the factual portion of that opinion did not indicate that Locke actually requested to use a telephone or to otherwise contact an attorney. She merely "elected not to say anything until she saw counsel." *Locke*, 152 Cal.App.3d at 1132, 200 Cal.Rptr. 20. The *Locke* court also did not find the statement to be involuntary or that the officers in that case had done anything to coerce the suspect to speak; they merely stayed in the same room with her.

■ Despite that, however, we hold that the police did not violate appellant's constitutional rights by holding him in the interview room, without an attorney, until 2:30 a.m., when he volunteered to give a statement. We hold that, absent a request to use the telephone to contact either an attorney or someone who would contact an attorney for appellant, the police had no affirmative obligation to provide an attorney, within the time appellant was sitting in the interview room, simply because appellant said he wanted to speak to an attorney before he gave a written statement. Therefore, and because there was no re-initiation of interrogation by the police after appellant's invocation of his *Miranda* rights, his statement was admissible.

The first questioning period, which began when appellant was brought to the interview room around 11:30 p.m., ended correctly when appellant asserted his right to remain silent until represented by counsel. Appellant's processing followed, which is a lawful practice even for a suspect who has asserted his *Miranda* rights. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) ("routine incidents of the custodial relationship," including requests for water or a telephone, do not "initiate" a re-interrogation for the purposes of *Edwards* ). After the processing, appellant was taken back to the interview room at 1:30 a.m., where he sat for an hour, dozing and then conversing with Needham. Needham did not initiate a re-interrogation of appellant, and did not pursue any actions aimed at inducing appellant to provide inculpatory evidence.

After considering the cases and arguments provided by appellant, we cannot agree that his confession should have been suppressed. The police did not violate any duty or any of appellant's rights, and appellant cannot undo his own decision to give an inculpatory statement. The trial court did not err in admitting the statement.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**